# Media-69th Street Trust Company's Trust Mortgage Pool Case.

Argued January 26, 1942. Before SCHAFFER, C. J.;
MAXEY, DREW, LINN, STERN, PATTERSON and PARKER, JJ.

*William K. Rhodes,* for appellant (claimant, appeal No. 11).

*John V. Diggins,* with him *John W. Lord, Jr.,* Special Deputy Attorney General, *Orville Brown,* Deputy Attorney General, and *Claude T. Reno,* Attorney General, for appellant (receiver, appeal No. 12).

*J. H. Ward Hinkson* and *Frank A. Moorshead,* with them *V. Gilpin Robinson, H. E. Potter,* and *Wm. T. Cooper,* for appellees.

OPINION BY MR. JUSTICE MAXEY, March 23, 1942:

This is an appeal from the decree of the Court of Common Pleas of Delaware County sustaining exceptions to the orders of the Auditing Judge. The petition of the Substituted Trustee for leave to pay the Receiver the sum of $9,214.23 in compromise of all claims against the fund of $25,002.98 was dismissed. The petition of the Receiver for leave to pay the executors of Frank B. Rhodes the sum of $9,214.23 received from the Substituted Trustee was also dismissed. The petition of V. Gilpin Robinson et al. for an order of court directing that the Receiver return to the Substituted Trustee the sum of $9,214.23 was granted. The Receiver was ordered to pay to the Substituted Trustee the sum of $9,214.23 to be retained by the latter and held until further order of court.

On September 30, 1933, the Secretary of Banking took possession of the Media-69th Street Trust Company (hereinafter called the Company) because of its insolvency. This Company was the trustee of a certain Trust Mortgage Pool consisting of 153 mortgages. The Company was also Trustee, Guardian, etc., of 829 separate and distinct estates, and in administering 529 of them it had invested their funds in participating certificates in the Trust Mortgage Pool, each estate receiving a particular certificate in the amount of the funds so invested. For some time prior to September 30, 1933, the Company as Trustee for the Mortgage Pool had made payments to certain certificate holders in anticipation of the receipt of interest on various mortgages of the Pool, which interest was in default at the time the payments to certificate holders were made, and on the date stated the Company as Trustee had advanced the sum of $25,002.98 in excess of the interest actually received on the mortgages. The interest so advanced was taken from the general trust fund accounts which it carried in the First National Bank of Media and the Real Estate Trust Company and with itself. In these deposit accounts the Company deposited funds coming into its hands in its fiduciary capacity, including not only principal and income from the Trust Mortgage Pool but also principal and income from all other investments made or carried by the Company as Trustee or Guardian or received by it in its capacity as fiduciary. On the date of the Company's closing the Receiver received $25,002.98 to make up the shortage in the Trust Fund Account.

Thereupon Frank B. Rhodes, who when the Company closed was its President, and William D. Gordon who in his capacity of Secretary of Banking was Receiver of the Company, entered into an agreement, identified herein as the Gordon-Rhodes Agreement, pursuant to which Rhodes delivered to Gordon cash and securities to the value of $72,800.85, all these being the former's personal property. The overdraft in the Trust Mortgage Pool in

the sum of $25,002.98 was included in the Agreement and was one of the items for which the sum advanced by Rhodes was indemnity.

Between September 30, 1933, and October 15, 1934, the Receiver collected interest on the mortgages in the Pool to the amount of $28,736.82 and applied this interest to the extent of $25,002.98 to repaying the various estates whose funds had been depleted in making advances to certificate holders in the Pool. On October 15, 1934, pursuant to the order of the court, the Receiver turned over to the Chester-Cambridge Bank and Trust Co., Substituted Trustee for the Pool, all of the mortgages and income constituting this Pool except the sum of $25,002.98 and in his account the Receiver asked credit for this sum of $25,002.98 for the reason above indicated. Exceptions to this credit were upheld by the Supreme Court of Pennsylvania and it directed on March 21, 1938, (329 Pa. 587) that this sum be turned over to the Chester-Cambridge Bank and Trust Co., Substituted Trustee for a further accounting and on May 24, 1938, this was done.

Frank B. Rhodes died on January 17, 1939, and his executors filed a petition on April 27, 1940, averring, inter alia, "That the sum of $25,002.98 so turned over was the money of Frank B. Rhodes, being the proceeds of the sale of the securities constituting the indemnity fund set up by Frank B. Rhodes under the Gordon-Rhodes Agreement and said fund was never the property of said Company in any capacity whatsoever, but was derived from the private means of Frank B. Rhodes and continued to remain so subject to the terms of the Gordon-Rhodes Agreement."

The Chester-Cambridge Bank and Trust Company, Substituted Trustee, filed its accounting in accordance with the "further proceedings" suggested by the Supreme Court. Exception to this accounting was filed by Rhodes and Luther A. Harr (the then Receiver), setting forth specifically that the sum of $25,002.98 appearing in the account of the Substituted Trustee should be returned to

the Receiver and Frank B. Rhodes, or so much thereof as could be shown to be due them under the law as expressed in the Supreme Court's opinion already referred to.

At a hearing held by the court below it was shown that there was collected by the Receiver, as delinquent interest on mortgages in the Pool, $9,214.23; by the Substituted Trustee either in the form of interest or as net rents, $4,775.78; by the Receiver as interest accrued on all mortgages between the late due date and the day of closing, $7,530.44; and the amount of such interest collected by the Substituted Trustee either in the form of interest or net rents, $2,611.36.

The foregoing sums total $24,131.81. The contentions of the Receiver and Mr. Rhodes were as follows: "1. They were presently entitled to be reimbursed in the sum of $24,131.81. 2. Even though they should not be entitled to reimbursement on the basis of collections of accrued interest, they were presently entitled to the sum of $13,-990.01. 3. Even though they be not entitled to any interest or rents collected by the Substituted Trustee on delinquent mortgages they were presently entitled to $9,-214.23. 4. No matter what they were presently entitled to receive, they could in the future from time to time as additional interest was received on said delinquent. mortgages and as the various accounts of the said Substituted Trustee should be filed, claim reimbursement to the extent of such collections without any limit as to time and up to the full extent of $25,002.98." The opposing contentions of the Substituted Trustee were as follows: "Frank B. Rhodes and the Receiver were entitled to be reimbursed: 1. Only out of interest from mortgages delinquent on the day of closing. 2. This only providing the interest on such mortgages had become paid up in full or current."

The amount of interest on current or delinquent mortgages was less than $9,214.23. After the death of Mr. Rhodes on January 17, 1939, three parties: the then Re-

ceiver, Rhodes' Executors and the Substituted Trustee, entered into an agreement subject to the court's approval to compromise the claims of the Receiver and the Executors against the Substituted Trustee for the sum of $9,-214.23 to be paid by the Substituted Trustee to either the Receiver or the Executors. A rule to show cause why this compromise agreement should not be carried out was granted and a copy of this rule was served upon V. Gilpin Robinson, Esq., who represented a certain percentage of the total interest in the mortgage pool. The Receiver demanded that the sum stated be paid to him as there was then pending an unrelated claim against the Receiver involving the Gordon-Rhodes Agreement which, if it had been successful, would have required the Receiver to retain the sum of $9,214.23 as indemnity under the Gordon-Rhodes Agreement. After a hearing on the return day of the rule the Court entered two decrees, one authorizing the Chester - Cambridge Bank and Trust Company to pay the above "compromise sum" to the Receiver and the other authorizing the Receiver to accept it in full compromise of the claims of the Receiver and the Executors to the sum of $25,002.98. V. Gilpin Robinson filed exceptions to these decrees in behalf of the holders of the certificates of the Mortgage Pool. These exceptions were dismissed. No appeal was taken. On December 12, 1939, the Substituted Trustee paid the Receiver the sum of $9,214.23.

The Executors of Frank B. Rhodes petitioned on April 27, 1940, the Court averring that the "Receiver has no longer any reason or right to retain the said sum of $9,214.23 received as a result of that agreement and . . . under the Gordon - Rhodes Agreement . . . said sum should be paid to the Executors." This latter agreement provided not only as above stated as to Rhodes' delivery of $72,800.85 in cash and securities to the Receiver of the closed bank, but also that the Receiver would "use reasonable effort to collect all claims and demands which the party of the first part may have as Trustee, against

the respective estates or funds to which overdrafts have been made, and when said collections have been made, and, if necessary, been approved by the respective Courts of Delaware County, and are found not to be necessary for the payments due under said trusts, to release quarterly, beginning June 30, 1934, out of the fund deposited an amount equal to such collections in the following order: first, securities remaining in his possession, and second, cash in equivalent sum, it being agreed that any ultimate deficiency arising, upon determining that it is impossible to make further collections, shall fall upon the funds so deposited and the balance of the fund deposited shall become the property of the party of the first part for the liquidation of the trust estates aforesaid, and he shall assign to the party of the second part any and all rights he may have in and to any claims remaining uncollected."

In the petition of the Executors it was also set forth that on April 12, 1940, the then Receiver of the Media-69th Street Trust Company filed his petition praying the Court to grant a rule upon the Chester-Cambridge Bank and Trust Company, Substituted Trustee, and V. Gilpin Robinson, Trustee, et al. to show cause why the Receiver should not be given leave to pay to the Executors of Frank B. Rhodes the sum of $9,214.23. The Executors joined in this prayer.

In the answer of V. Gilpin Robinson it is averred, inter alia, that "the Gordon-Rhodes Agreement was entered into voluntarily by said Rhodes and its purpose was to restore depleted funds. . . . By its terms Rhodes is and was a volunteer. He is not entitled to contribution." It is further averred "that [1] the then Receiver, [2] Rhodes' Executors and [3] the Substituted Trustee, for reasons known to them, did enter into what purported to be an agreement of compromise of the claims of the Receiver and Rhodes against said Substituted Trustee, for the sum of $9,214.23, which was made subject to the approval of the Court of Common Pleas, with-

out notice to or consultation with any holders of participating certificates, their trustees or attorneys. It is averred that said agreement of compromise, as well as the subsequent actions of the Court thereon, were and are totally null and void, by reason of Respondent's objections thereto, by lack of power of the Receiver so to do, under the law, and by lack of jurisdiction of the Court to order or to approve such a compromise over Respondent's objections. Further, that no final order or decree has yet been made by any Court, with respect to said alleged compromise." It is also "denied that under the Gordon-Rhodes Agreement the said sum of $9,-214.23 should be paid to the Executors of the Estate of Frank B. Rhodes, deceased. On the contrary it is averred that said sum should forthwith be returned to Chester-Cambridge Bank and Trust Company, Substituted Trustee of the Trust Mortgage Pool, for distribution among the holders of participating certificates according to law (329 Pa. 587). It is further averred that the Gordon-Rhodes Agreement shows in itself that said Rhodes was and is a volunteer within the meaning of the Pennsylvania decisions, and hence cannot recover anything. It is further averred that since the gravaman of Rhodes' claim is the use of his funds to pay the $25,-002.98 surcharge to the Substituted Trustee, and since such payment is outside the scope of the Gordon-Rhodes Agreement, Rhodes' remedy is not against the fund now in Court, but is to surcharge the Receiver for misapplication of the funds put up by him for a specific purpose."

Judge MACDADE of the Court below on May 16, 1940, made absolute the rule to show cause why the Receiver should not pay to the Rhodes' Executors the sum of $9,-214.23 received by him in accordance with the aforementioned decrees of the court. The opinion stated, inter alia: "The decrees of May 4th and 5th approving the compromise, while excepted to, stand today unreversed as no appeal was taken within three months of the dismissal of the exception." He also declared that Mr.

Rhodes was *not* a volunteer. On that phase of the case he said: "Mr. Rhodes only advanced that sum on certain conditions and promises for reimbursement and those conditions and promises are set forth in the Gordon-Rhodes Agreement. At that time the affairs of the Trust Company were in the hands of the court through its right arm, the Receiver. A person is not a volunteer under such conditions when the court could use its process to compel the agreement herein. Look at the consequences to him if he had not! The agreement is, however, valid and binding and not against public policy but, on the contrary, Mr. Rhodes did a very laudable act in putting up these funds to facilitate the settling up of the various estates for which the bank was trustee. In all equity and good conscience the executors are entitled to be paid the sum of $9,214.23 by the receiver under the Gordon-Rhodes agreement. . . . The issue raised by the petition and answer, therefore, is whether or not the money should go to the executors or back to the substituted trustee. It would be reducing legal procedure to absurdity to suggest that, after hundreds of pages of testimony, days of the court's time, a solemn agreement of compromise and the approval thereof by the court, the whole proceedings should be nullified by returning the sum involved to the very party who originally paid it."

Exceptions were filed to Judge MacDade's order and opinion and the matter was later heard before a special court en banc consisting of Judge John E. McDonough of the Orphans' Court of Delaware County and Judge W. Butler Windle of the Court of Common Pleas of Chester County and Judge A. D. MacDade of the Court of Common Pleas of Delaware County. This court, with Judge MacDade dissenting, sustained the exceptions to the order of the Auditing Judge and dismissed the petition of the Substituted Trustee for leave to pay the Receiver the sum of $9,214.23 in compromise of all claims against the fund of $25,002.98. The petition of the Re-

ceiver for leave to pay the Executors of Frank B. Rhodes the sum of $9,214.23 received by it on December 12, 1939, from the Substituted Trustee was dismissed. The petition of V. Gilpin Robinson et al. filed June 13, 1940, for an order directing that the Receiver return to the Substituted Trustee the sum of $9,214.23 was granted. The Receiver was ordered to pay this sum to the Substituted Trustee to be held by the latter until further order of court.

The court en banc based its conclusion on the decision of the court in *Klein v. Dunn*, 337 Pa. 480, 12 A. 2d 56. The lower court said: "The pronouncement of the Supreme Court . . . is that no claim for recoupment of delinquent interest under the circumstances before us may be allowed and awarded until the Substituted Trustee has filed its final account. Since that has not here been done the orders here excepted to directing such recoupment were prematurely, and therefore improperly entered at the time or times they were made and the credit for said payment appearing in the Special Supplemental Account filed by the Substituted Trustee should not have been allowed. The exceptions to said orders and to that item in the account must be sustained. It follows that the rule to show cause why the fund of $9,214.23 should not be repaid by the Receiver to the Substituted Trustee was not properly dismissed in the order of August 27, 1940, but that said repayment should have been directed —as now it must be. This is so, in our opinion, because we believe that the fund of $25,002.98, except as depleted by counsel fees paid thereoutof, should be kept intact in the hands of the Substituted Trustee to be accounted for in its final account on the audit of which it is properly distributable to those entitled thereto, under the authority of *Klein v. Dunn,* supra. The agreement of compromise above referred to works no different result. Under the decisions of the Supreme Court . . . the claim for recoupment here could not properly be asserted on the filing of this partial account. Consequently those

interested in the assets of the trust mortgage pool, even though they had notice of the audit of the account, had no reason to believe that this claim would be then presented and cannot be bound by a compromise agreement in regard thereto, made at said audit, to which they are not actual parties. They were within their rights in awaiting the Audit of the final account before objecting to such recoupment if they then wish to do so. The agreement in question does not preclude them in that respect."

We agree with the court below that this case is ruled by our decision in *Klein v. Dunn,* supra, where we said: "A trustee who has made unauthorized and voluntary advancements of interest, without disclosing that fact to the cestuis que trustent, cannot assert a right of general recoupment against either the beneficiaries or the trust estate. As we said in *Media-69th Street Tr. Co.'s Tr. Mtge. Pool Case,* 329 Pa. 587, 591: '. . . his right of reimbursement is limited to the income thereafter earned upon the identical investments on which the advancement was made. If the particular interest advanced is subsequently collected, the trustee may obtain reimbursement therefrom, and the transaction is closed. If the particular interest advanced cannot be collected, the transaction remains open, and any loss arising therefrom must be borne by the trustee who volunteered the payment.' See also: *Klein's Est.,* 326 Pa. 393; *Nauman's Est.,* 110 Pa. Superior Ct. 55. In the case of the Media-69th Street Trust Company, the trustee had already collected approximately $7,300, which admittedly represented 'the particular interest advanced,' and as to that amount we indicated that there was a right of recoupment. Nevertheless, we held that the claim was prematurely made, inasmuch as the final account of the substituted trustee had not yet been filed. It does not follow from the fact that advancements for delinquent interest have been made to bondholders under the circumstances here present that such advances must be reimbursed from the first moneys paid upon the mortgage, or that the pay-

ments so received shall be treated arbitrarily as repayment of the 'particular interest advanced.' It must be remembered that these advancements were made without any indication to the bondholders that the mortgagor had defaulted, and that they were kept in ignorance of the impairment of their investment for a period of two years thereafter. Had they known the true situation, they could have immediately instituted foreclosure proceedings, or taken other appropriate action to protect their rights. Instead they were lulled into a false sense of security by acts of the trustee Bank amounting to a representation that there had been no default. In view of these circumstances, it would be inequitable to permit the trustee Bank to assert that the interest payments for which the advances were made were not in fact paid by the mortgagor, if the assertion would work prejudice to the bondholders: *Paine v. Bank,* 194 Pa. 403. See also *Fedas v. Ins. Co. of State of Penna.,* 300 Pa. 555. . . . In volunteering these advancements without disclosure of the default, the Reading Bank violated its duty as a fiduciary to inform the cestuis fully of all matters affecting their interest, and accordingly it must be held to have assumed the risk that the particular installments of interest advanced might never be repaid. In *Commonwealth Trust Co. Case,* 331 Pa. 569, where advancements by the trustee had been rendered necessary through improper use of certain trust funds, we said (p. 580): 'Under the circumstances, the Trustee cannot claim a priority in order to recoup itself for loans made necessary by its own misconduct. This claim can be asserted only after the bondholders have been paid in full.' "

We agree with the appellee that the so-called "compromise" referred to by the Auditing Judge is not decisive in this case. It was an agreement between only three parties though there were several hundred holders of participating certificates who would be affected by it if it was recognized as binding upon them. The decrees made

on May 4th and 5th, 1939, based on this "compromise" were expressly made "without prejudice." This indicates that there were rights not affected by it and which could be asserted in further proceedings. The phrase "without prejudice" ordinarily imports the contemplation of further proceedings and when it appears in an order or decree it shows that the judicial act done is not intended to be res judicata of the merits of the controversy. "The words 'without prejudice' import into any transaction that the parties have agreed that as between themselves the receipt of money by one and its payment by the other shall not of themselves have any legal effect on the rights of the parties, but they shall be open to settlement by legal controversy as if the money had not been paid. *Hinton v. Bogart,* 140 N. Y. S. 111, 113, 79 Misc. 418.".

Appellee pertinently points out that the rights of the Rhodes Estate rise no higher than those of the Receiver and since the Receiver voluntarily stated his account without reference to any claim for reimbursement or recoupment against any of the estates holding participating certificates by reason of an alleged advancement of interest, both the Receiver and the Rhodes Estate are estopped from making claim to the fund at this time, as the participating certificate holders are preferred claimants to the fund under the rule of law laid down in *Klein v. Dunn,* supra.

We agree that when Frank B. Rhodes deposited these moneys and securities with the Secretary of Banking he was a volunteer. "One who is under no legal obligation or liability to pay a debt is, if he pays it, a mere 'volunteer', and cannot invoke the principle of exoneration through subrogation to the rights and securities of the creditor": *McKinnon v. New York Assets Realization Co.* (C. C. A. N. Y.), 217 F. 339, 343. "In reference to the rule of subrogation, a stranger has been said to be not necessarily one who has nothing to do with the transaction out of which the debt grew. Any one who is under no legal obligation or liability to pay the debt is a

stranger, and, if he pays the debt, a mere volunteer; so that, where agents employed to invest money for a mortgagee, on failure of the mortgagor to pay the interest, remitted the amount of the interest coupons without the knowledge of the mortgagor or mortgagee, they were mere volunteers: *Bennett v. Chandler,* 199 Ill. 97, 64 N. E. 1052, 1055.

We agree also that the certificate holders have preferred claims until they are paid in full. There is nothing in the Gordon-Rhodes Agreement to the contrary. It expressly provides that "payments due under said trusts" have the first claim on any collections made "against the respective estates or funds to which overdrafts have been made" and that "any ultimate deficiency arising, upon determining that it is impossible to make further collections, shall fall upon the funds so deposited". In *Media-69th Street Trust Company's Trust Mortgage Pool Case,* 329 Pa. 587, 197 A. 918, this court held that where the Secretary of Banking, in possession of a closed trust company, collects interest on mortgages in a trust mortgage pool, in his capacity as receiver of the mortgage pool, and, thereafter, a substituted trustee is appointed, and an account is filed by the secretary, the latter may not at such time retain interest on the mortgages in the pool collected by him, for reimbursement as to advances theretofore made by the trust company to holders of the mortgage participation certificates, even interest on the identical mortgages as to which advances were made, and claim credit therefor in his account, but must turn over all the assets of the mortgage pool, including all the interest received to the substituted trustee, and assert his claim for reimbursement at the time of audit of the account of the substituted trustee.

The decree is affirmed at appellants' cost.